IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| AUBREY CLIFTON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 3:04-CV-344RM |
| | ) | |
| CITY OF MICHIGAN CITY, INDIANA; | ) | |
| CITY OF MICHIGAN CITY POLICE | ) | |
| DEPARTMENT; GENE SIMMONS, | ) | |
| individually and in his official capacity | ) | |
| as Chief of Police; BRYAN MAXEY, | ) | |
| CARY BRINKMAN, individually and | ) | |
| in their official capacities as detectives | ) | |
| for the MICHIGAN CITY POLICE | ) | |
| DEPARTMENT. | ) | |
| | ) | |
| Defendants | ) | |

OPINION AND ORDER

Officer Bryan Maxey and Detective Cary Brinkman seek summary judgment on Aubrey Clifton's claims under federal and Indiana law. For the following reasons, the court grants the defendants's motion with respect to the federal claims and dismisses the state law claims without prejudice.[1]

---

[1] Mr. Clifton's response to summary judgment states he "concedes that the City of Michigan City, Gene Simmons and the Michigan City Police Department had no liability in this case."

FACTS

The following facts are taken from the summary judgment record and are viewed as favorably to Mr. Clifton as is reasonable. Several days before August 20, 2002, a confidential informant told Detective Brinkman—an officer with Michigan City's special operations drug task force—that crack cocaine could be purchased from an individual known to the informant as "Bree." When asked how the informant knew Bree, the informant responded "well, you know, you guys just arrested him … he just recently go out." The informant also told Detective Brinkman that "Bree lived over on Grant Street on that hill by the white house," drove a Cadillac, and was staying by Columbia Street in Michigan City. The informant didn't know Bree's real name, but gave a physical description, including that Bree wore his hair in cornrolls. Detective Brinkman believed the brief physical description to match the physical appearance of Mr. Clifton, whom he had arrested in 1999 for dealing cocaine. The informant never mentioned Mr. Clifton's name during the conservation.

On August 20, Detective Brinkman and Officer Maxley met with the same informant and based upon statements the informant made on that day as well as the previous statements to Detective Brinkman, two separate drug transactions were staged. Detective Brinkman was in charge of the August 20 investigation, with Officer Maxey's role limited to video surveillance. The target of the investigation was a suspect, who Detective Brinkman advised Officer Maxey was "Maurice Aubrey." Officer Maxey's belief that the suspect's name was Maurice

2

Aubrey was also based upon hearing the informant's statements to Detective Brinkman: the informant said that crack cocaine could be purchased by calling an individual named Maurice Aubrey who went by the nickname Bree. The informant believed Bree was selling crack cocaine because of prior conversations the informant had with the suspect. The informant again gave a physical description of the suspect and again stated that he had previously been arrested by Michigan City police officers for dealing cocaine. The informant also stated that the suspect used to live in the 200 block of Grant Street on the west side of Michigan City, but now lived on 113 Columbia Street. Based upon the informant's statements, Detective Brinkman believed that the dealer whom the informant was referring to as Maurice Aubrey was really the plaintiff, Aubrey Clifton. Officer Maxey knew the name Aubrey Clifton but had had no prior dealings with Mr. Clifton, nor could he identify him.

For the first purchase, the informant was equipped with a transmitter and recorder for transmitting and recording conversation. The informant— followed by Detective Brinkman and Detective Richardson — drove to 113 Columbia Street. Officer Maxey went to the area to set up video surveillance of the transaction. The informant pulled into an alley at the rear of the house where he encountered a black female outside the house sitting on a picnic table; she was wearing a blue shirt, blue jeans, and had long hair extensions. The picnic table was out of the officers' view, including Officer Maxey, so no video surveillance of the transaction

3

was obtained. When the informant asked about Bree, the woman said he would return soon.

The informant purchased three individually wrapped pieces of yellow rock substance (later determined to be crack cocaine) from the woman. The informant again asked the woman about Bree's return and about obtaining more crack cocaine. The woman said that Bree should be back, but not to tell him that she had sold the informant the drugs.

After the deal, the informant was searched and questioned about the transaction. The informant believed the female to be Bree's sister.

Detective Brinkman and Officer Maxey returned to 113 Columbia Street, and pulled into the alley which the informant had entered. They could see a black female matching the description given by the informant, but because the officers didn't know the female's identity, they called Corporal Elkins, who worked that part of Michigan City. Corporal Elkins passed the location and identified the female as Theresa Redden. Detective Brinkman located a photo of Ms. Redden and confirmed the identification.

For the second purchase, the informant was again equipped with a transmitter and recorder. The informant, who was also given $100.00 of buy money, drove to a pay phone at the corner of 6th and Washington Street, Michigan City, and called the suspect Bree. Neither Detective Brinkman or Officer Maxey ever verified that the number dialed by the informant was Mr. Clifton's. Detective Brinkman, Officer Maxey and Detective Richardson monitored the call

4

via a transmitter. The suspect told the informant to meet him at the Crown Liquors located at the corner of 8th Street and Michigan Boulevard, Michigan City. Officer Maxey again set up video surveillance, and parked some 100 feet south of the Crown Liquor's parking lot. Officer Brinkman and Detective Richardson followed the informant until s/he pulled into Crown Liquors. Detective Brinkman and Detective Richardson parked two blocks away on Spring Street.

Shortly after the informant parked at Crown Liquors, the suspect arrived in a white pickup truck with orange seat covers and Kentucky license plates. Initially, the informant didn't recognize the vehicle because it was a vehicle which the suspect Bree hadn't been in before. The suspect then got out of the truck and said something to the informant; at that point, the officers couldn't see the suspect's face. The informant asked if they were going to go to the suspect's house and he responded no. The suspect told the informant to follow him, and they pulled into an art center a block and a half away.

At the art center, the informant and the suspect were out of visual contact with the officers. The informant approached the suspect in the white pick up truck and gave him $100.00 in exchange for three individual bags of yellow rock like substance which was later determined to be less than 3 grams of crack cocaine. The officers heard the informant and the suspect make the drug transaction over the receiver, but none witnessed the transaction. Detective Brinkman and Officer Maxey heard the informant refer to the individual as "Bree" two or three times.

5

The informant returned to his car and indicated over the transmitter that the suspect's truck was heading west along 8th Street. Detective Brinkman pulled his car around so he was facing south on Spring Street at the corner of 8th. When the suspect pulled up to the intersection at 8th and Spring, Detective Brinkman was parked in his vehicle 30 feet away from the suspect's vehicle; Detective Brinkman could tell the suspect was the only person in the vehicle. The suspect then turned left so as to head south on Spring Street. During the turn, Detective Brinkman could observe the driver for two to three seconds. He couldn't see the suspect's face but saw that the suspect wore a large brimmed hat with cornrolls sticking out the back. Detective Brinkman determined that it was the same truck from the liquor store based upon the license plate. The truck wasn't stopped because future transactions were anticipated, but no future transactions were set up.

Detective Brinkman completed the case report from the first August 20 buy. He reported that he believed the individual that the informant and Ms. Redden were referring to—"Bree"—was Aubrey Clifton. He based this belief on the informant's physical description of the suspect and statements that the suspect went by the nickname "Bree," wore his hair in cornrolls, lived on the hill on Grant Street by a white house, drove a Cadillac, had just gotten out of jail, and had been previously arrested by Detective Brinkman. When Detective Brinkman received this information and filled out the report, he knew that he had previously arrested Mr. Clifton and that Mr. Clifton had recently been released. Detective Brinkman

also had seen him more than once since his prior arrest in a Cadillac, and almost each time his hair had been in cornrolls. He didn't know if Mr. Clifton owned the Cadillac or still lived on Grant Street, but he had seen him in the area. This is also the same area which he had arrested Mr. Clifton in 1999 for dealing cocaine. The case report also states that he knew Mr. Clifton stayed at the house on Columbia Street, but there is no evidence that Detective Brinkman knew whether Mr. Clifton lived there permanently.

Detective Brinkman noted in the second case report that the informant believed Bree's real name to be Maurice Aubrey, but that Aubrey Clifton was the driver of the white truck. This identification was based on prior conversations with the informant and his two-to-three second identification of an individual, who he believed and still does, was Mr. Clifton. Detective Brinkman believes that the suspect had given the informant a pseudonym so that the informant didn't know his real name.

From August to December the case remained open, but little follow-up investigation took place. The white truck's license plate number was checked but the owner was never called and no connection to Aubrey Clifton was established. The phone number that informant used to contact the suspect was never verified as that of Mr. Clifton's and no further drug buys were staged because the informant's activities in other drug cases prohibited him from participating in additional drug purchases with the suspect. Near the end of 2002, though, a unit commander decided to seek warrants in all open cases.

7

On December 23, 2002, Officer Maxey testified at the probable cause hearing before a state court judge on behalf of Detective Brinkman, who was out of the office. Officer Maxey based his testimony on Detective Brinkman's August 20 reports, prior discussions with Detective Brinkman, and recordings of the transactions. Officer Maxey testified under oath that "[t]he confidential informant placed a telephone call to Aubrey Clifton and arranged a $100 narcotics transaction," that "Aubrey Clifton pulled in the parking lot next to the informant in a white pick up truck," that "the confidential informant handed Aubrey the one hundred dollars in pre-recorded buy money while they were engaging in a general conversation" that "Aubrey in turn handed the confidential informant back three pieces of an off-white color rocky substance wrapped in plastic," that "the white pick-up truck occupied by Aubrey Clifton drove directly past Detective Carey Brinkman," and that "Detective Brinkman was able to positively identify Aubrey from past cases concerning Aubrey." An arrest warrant was issued for Mr. Clifton on the charge dealing in cocaine as a class B felony.

In March, Detective Brinkman and Officer Maxey asked Mr. Clifton's probation officer about his next scheduled probation meeting. The officers told Mr. Clifton's probation officer that they had a warrant for his arrest; the probation officer appeared shocked by this because she believed Mr. Clifton had complied with the terms of his probation, and because he was currently employed. When Mr. Clifton arrived for his March probation meeting, he was taken into custody and transported to the Michigan City police station where he was questioned about

8

certain drug buys. The officers obtained Mr. Clifton's cell phone number, which turned out to be a different number than the number used in the August 20 purchases. Detective Brinkman asked that Mr. Clifton cooperate with the police in staging future drug buys. Mr. Clifton was given the weekend to consider the offer, but when Detective Brinkman did not hear from him, he called Mr. Clifton several times. Eventually Mr. Clifton declined the offer.

Detective Brinkman and Officer Maxey arrested Mr. Clifton when he appeared for his May 2003 scheduled probation meeting. Mr. Clifton wasn't questioned at that time; he remained in custody until July 17, 2003, when it was determined at a hearing that Mr. Clifton was at work during the time of the August 20 transaction. The charges against Mr. Clifton were dismissed.

## DISCUSSION

Mr. Clifton's complaint alleges that the actions of the defendants "violate the fourth and fourteenth amendment to the U.S. Constitution and 42 U.S.C. § 1983, and the Indiana Constitution, Art. I §§ 11 and 12, and resulted in false imprisonment." Mr. Clifton's response indicates he alleges claims of false arrest pursuant to § 1983, as well as state law tort claims of false arrest and false imprisonment. Officer Maxey and Detective Brinkman move for summary judgment on all claims.

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits,

9

if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Ritchie v. Glidden Co., 242 F.3d 713, 720 (7th Cir. 2001). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the non-movant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004); *see also* Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events") *quoting* Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 504 (7th Cir. 1999).

Officer Maxey and Detective Brinkman contend they had probable cause to arrest Mr. Clifton for dealing cocaine, and if not, they are entitled to a qualified immunity. The threshold question in determining whether Detective Brinkman and Officer Maxey enjoy a qualified immunity from a suit for damages under § 1983 is

10

whether the facts, taken in the light most favorable to Mr. Clifton, show that their conduct violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001).[2] Mr. Clifton says that Detective Brinkman's August 20 reports identifying Mr. Clifton as the suspect and Officer Maxey's subsequent materially false statements to Judge Chapala during the probable cause hearing caused him to be arrested without probable cause and falsely imprisoned in violation of the Fourth and Fourteenth Amendments.

    Because the arrest in this case was made pursuant to a facially valid warrant issued by a judicial officer, Officer Maxey and Detective Brinkman violated Mr. Clifton's rights only if reasonably well-trained officers in their position should have known that the testimony or affidavits they provided in support of the warrants would have failed to establish probable cause, so that they should not have applied for the warrants in the first place. Beauchamp v. City of Noblesville, Ind., 320 F.3d 733, 742 (7th Cir. 2003) *citing* Malley v. Briggs, 475 U.S. 335, 345 (1986) ("only where the warrant application is so lacking in indica of probable cause as to render official belief in its existence unreasonable will the shield of immunity be lost"). Mr. Clifton must point to evidence in the record showing that Officer Maxey or Detective Brinkman intentionally or with reckless disregard for the truth, made false statements to a judicial officer, and that the false statements were necessary

---

[2] To determine the availability of qualified immunity in a particular case the court engages in a two-step inquiry; but only if a constitutional right is violated must the court determine if that right was clearly established at the time of the alleged violation. Finsel v. Cruppenink, 326 F.3d 903, 906 (7th Cir 2003).

to the judicial officer's determination that probable cause existed for the arrest. Beauchamp v. Noblesville, 320 F.3d at 742. A reckless disregard for the truth is demonstrated by showing that the officers entertained serious doubts about the truth of their statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts that would negate probable cause. Beauchamp v. Noblesville, 320 F.3d at 743; *see also* Olson v. Tyler, 825 F.2d 1116, 1121 (7th Cir. 1987).

Mr. Clifton challenges Officer Maxey's statement that the "confidential informant placed a telephone call to Aubrey Clifton and arranged a one hundred dollar narcotics transaction." Even assuming that this statement is false, Mr. Clifton hasn't identified any evidence in the record that demonstrates that it was made with a reckless disregard for the truth. Mr. Clifton says Detective Brinkman's initial assumption that he was the suspect "Bree" is unreasonable, and thus Officer Maxey shouldn't have testified that he was the suspect. Mere negligence by an officer in giving a statement, though, doesn't constitute reckless disregard for the truth. United States v. A Residence Located at 218 Third Street, 805 F.2d 256, 258 (7th Cir.1986). Detective Brinkman's deposition testimony is that when he made the August 20 case report, he believed the individual who the informant had called to set up the transaction was Mr. Clifton. This belief was based upon prior dealings with Mr. Clifton and the numerous characteristics he shared with the suspect. This suspicion was later confirmed when Detective Brinkman witnessed

12

what he believed to be Mr. Clifton leaving the drug deal in a car which matched the description of the dealer's car.

Nothing in the record indicates that Detective Brinkman had serious doubts that informant called Mr. Clifton. This information was recorded in Detective Brinkman's reports and later conveyed to Officer Maxey, who testified that the informant called Mr. Clifton. Based upon conversations with Detective Brinkman and the audio tape of the August 20 transactions, Officer Maxey had no reason to doubt the accuracy of Detective Brinkman's report. *See* United States v. Hensley, 469 U.S. 221, 232- 233 (1985).

While Officer Maxey's testimony omits several facts that could have been important to Judge Chapala's probable cause determination—the number used in the August 20 transaction was never verified as Mr. Clifton's and that Detective Brinkman had the opportunity to witness the suspect for only three seconds at a distance of 30 feet —these omissions don't negate the judge's finding of probable cause. Probable cause existed in this case if at the moment when Officer Maxey and Detective Brinkman sought the warrant for Mr. Clifton's arrest, the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing Mr. Clifton had committed the crimes. Beauchamp v. Noblesville, 320 F.3d at 743, *quoting* Hunter v. Bryant, 502 U.S. 224 (1991).[3] The court looks to what the officers

---

[3] Indiana defines the crime of dealing in cocaine as the manufacture or delivery of cocaine; it is a class B felony if less than 3 grams. IND. CODE § 35-48-4-1.

knew at the time they sought the warrant and "not at how things turned out in hindsight." Beauchamp v. Noblesville, 320 F.3d at 743.

When the officers sought the warrant, they knew a confidential informant had told Detective Brinkman about an individual that was selling crack cocaine and who went by the nickname Bree. They knew the informant had said the suspect had been arrested by Michigan City police officers, had just gotten out of jail, was living or used to live "on the hill on Grant street," drove a Cadillac, and wore his hair in cornrows. They knew Detective Brinkman had arrested Mr. Clifton for cocaine dealing, had just got out of jail, that Mr. Clifton went by the nickname "Bree," and that Detective Brinkman had seen Mr. Clifton more than once since his arrest—at least once at a house on Grant Street and at least once riding in a Cadillac—and both times Mr. Clifton's hair had been in cornrows. From their personal involvement in August 20 drug deal, the officers knew that the informant placed a call to the suspect, that the suspect arrived at Crown Liquors and sold the informant cocaine, and that the informant referred to the individual as Bree during the transaction. They also knew Detective Brinkman had seen the suspect driving away from the deal and believed the suspect to be Mr. Clifton based upon his prior dealings with him.

Mr. Clifton contends that the officer's failure to follow up the August 20 investigation by verifying Mr. Clifton's phone number negates probable cause. The court cannot agree.

When an officer has received information from a witness, who it seems reasonable to believe is telling the truth, she has probable cause and is entitled to rely on what she knows in pursuing an arrest; the officer is under no further duty to investigate. Spiegel v. Cortese, 196 F.3d 717, 724-725 (7th Cir.1999). But if information from or about the witness would lead a reasonable officer to be suspicious, the officer should conduct further investigation before making an arrest. Hebron v. Touhy, 18 F.3d 421, 422-423 (7th Cir.1994).

Based upon the numerous characteristics Mr. Clifton shared with the suspect, Detective Brinkman believed the informant was referring to Mr. Clifton when speaking about an individual who was selling crack cocaine. Nothing in the record indicates that the informant wasn't telling the truth. Officer Maxey and Detective Brinkman had worked with this informant on previous cases, including Theresa Redden's arrest, which corroborated the informant's story. That the informant used the wrong name, Mr. Clifton argues, would make a reasonable officer suspicious of whether Mr. Clifton was the suspect. The officers engaged in further investigation: they staged the August 20 drug deal with the suspect, and only after seeing an individual whom Detective Brinkman believed was Mr. Clifton did he record in his report that the caller was Mr. Clifton.

Because the record shows the informant's statements were sufficiently reliable, and were later corroborated by an additional investigation, as well as Detective Brinkman's identification, no reasonable jury could find that the officers

15

didn't have probable cause to arrest Mr. Clifton for the act of dealing in cocaine.[4] Therefore, the officers had no further duty to investigate, and Officer Maxey's failure to mention that Mr. Clifton's number wasn't verified doesn't negate probable cause. *See* Beauchamp v. Noblesville, 320 F.3d at 744.

Mr. Clifton also says that the circumstances surrounding Detective Brinkman's identification negate probable cause. The record, however, doesn't indicate that Detective Brinkman isn't a credible witness, and the opportunity to observe a person for three seconds from 30 feet is adequate for an officer who is a trained observer, had dealt with the suspect before, and had independent knowledge of his features. The weight this testimony is given is a question, not for police officers in the discharge of their considerable duties, but for the jury in a criminal trial. *See* Spiegel v. Cortese, 196 F.3d at 725 .

In sum, viewing the evidence in a light most favorable to Mr. Clifton, no reasonable jury could find that reasonably well-trained officers in defendants's position should have known that the testimony and reports they provided in support of the warrants would have failed to establish probable cause, so that they should not have applied for the warrants in the first place. Mr. Clifton hasn't established that the officers acted with reckless disregard for the truth, that is,

---

[4] When the question of probable cause arises in a damages suit its resolution typically falls within the jury's province, though a conclusion that probable cause existed as a matter of law is appropriate when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them. Maxwell v. Informantty of Indianapolis, 998 F.2d 431, 433 (7th Cir.1993). The parties in this case don't dispute the events leading up to the arrest of Mr. Clifton.

16

that Detective Brinkman had serious doubts as to the truth of the statements in the case reports or that Officer Maxey doubted the accuracy of that reported information. Furthermore, the record shows that the officers investigated and relied on sufficient information to establish a reasonable belief that Mr. Clifton had sold crack cocaine and thus had probable cause to arrest him.

Accordingly, the court grants Officer Maxey's and Detective Brinkman's motion for summary judgment with respect to the claims of false arrest and false imprisonment pursuant to 42 U.S.C. § 1983.

Mr. Clifton also brings state law claims for false arrest, false imprisonment, and violation of the Indiana Constitution (and the parties disagree as to whether there even is a private right of action for damages under Article I §11 of the Indiana Constitution). Having resolved the federal claims, the court relinquishes it supplemental jurisdiction over those state law claims. *See* Hoagland v. Town of Clear Lake, IN, 415 F.3d 693, 700 (7th Cir. 2005). With no remaining federal issues, resolution of those claims brought under Indiana law by an Indiana citizen against an Indiana municipality should be left to the Indiana courts.

## CONCLUSION

For the foregoing reasons, the court grants the defendants's summary judgment motion [Doc. No. 18] with respect to the plaintiff's claim under 42 U.S.C. § 1983, and dismisses the state law claims without prejudice to their renewal in an Indiana court. The clerk shall enter judgment accordingly.

SO ORDERED.

Entered: <u>January 24, 2006</u>

<u>    /s/ Robert L. Miller, Jr.    </u>
Chief Judge
United States District Court
